UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
 ---------------------------------------------------------------------- X
LEROY MOORE,

                                    Plaintiff,

                                                          **REPORT AND**
          -against-                                       **RECOMMENDATION**

HOULIHAN'S RESTAURANT, INC. ET AL.,                       07-CV-03129 (ENV) (RER)

                                    Defendants.
 ---------------------------------------------------------------------- X


**RAMON E. REYES, JR., United States Magistrate Judge:**

Plaintiff Leroy Moore ("Moore") brought this action for employment discrimination

against defendants Houlihan's Restaurant, Inc. ("Houlihan's"), Ravi, Reggie, and Aaron Doe

(collectively, the "named employees"), Mantiff Management, Inc. ("Mantiff"), and Falgun

Dharia ("Dharia"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§ 2000e et seq., Article I Section 11 of the New York State Constitution, New York State Human

Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290-296, and the New York City Human Rights

Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-107, 8-502.[1]  The Clerk of Court entered default

against Mantiff (Dkt. 7) and Dharia (Dkt. 4).  On August 23, 2010, the Honorable Eric N.

Vitaliano granted Moore's motion for default judgment against Mantiff and Dharia, and referred

the matter to me to conduct a damages inquest and issue a report and recommendation pursuant

to 28 U.S.C. § 636(b)(1)(B).  (Dkt. 11.)  For the reasons that follow, I respectfully recommend

Moore be awarded a total of $97,763.43.

---

[1]  Moore asserted various common law claims in his complaint as well, such as negligent
infliction of emotional distress and assault, but both in his supplemental papers and at the
hearing, Moore argued for damages for employment discrimination only.

## BACKGROUND

Moore is an openly homosexual African American man. Mantiff owned the Houlihan's Restaurant franchise, located at 139 Flatbush Avenue in Brooklyn (the "Restaurant"), where Moore was briefly employed. (Compl. ¶¶ 1, 22.) Dharia is the founder and president of Mantiff. (*Id*. at ¶ 12.)

The Restaurant employed Moore as a host from October 7, 2006 through October 27, 2006. (*Id*. at ¶ 22.) Moore experienced discrimination based on his race and sexual orientation almost immediately upon beginning work. (*Id*. at ¶ 24.) During his brief employment at the Restaurant, certain employees threatened Moore with physical injury, harassed him with racial epithets and made other disparaging comments. (*Id*. at ¶¶ 25-28.) Moore reported this discrimination to his superiors, but they took no action to discipline the offending employees. (*Id*. at ¶ 30.) When Moore finally confronted a female co-worker after one instance of harassment, the Restaurant terminated Moore, stating that his use of vulgar language in front of customers was against company policy. (*Id*. at ¶ 32.)

As a result of this discrimination and retaliatory termination, plaintiff filed the instant civil rights action on July 27, 2007. (*See* Dkt. 1.) Houlihan's, on behalf of itself and the named employees, executed a settlement agreement dated December 18, 2007, and Judge Vitaliano dismissed the complaint against these defendants. (Dkt. 11.) Dharia and Mantiff, however, failed to file an answer or otherwise appear in this action. Judge Vitaliano granted plaintiff's motion for default judgment against Mantiff and Dharia. (*Id.*) Subsequently, plaintiff filed and served on defendants documentation in support of his damages calculation, estimating $30,000 for lost wages, $50,000 for pain and suffering, and seeking $40,000 in attorneys' fees. (Supplement to

Plaintiff's Motion for Default Judgment ("Suppl."), dated Aug. 2, 2010, at 5, 7.)  However,

Moore did not provide a mechanism for calculating compensatory damages; thus, there was too

little support for Moore's damages calculation to issue a report and recommendation.

Accordingly, I held an evidentiary hearing on March 24, 2011.  (Dkt. Entry, 3/24/2011.)  At the

hearing, Moore testified as to his economic losses and pain and suffering, and submitted a

psychologist's report in support of mental distress.  Mantiff and Dharia did not appear.

## FINDINGS OF FACT

According to Moore's testimony, the Restaurant hired Moore on or about October 6,

2006, (Tr. at 6), and promised to pay him $9 per hour, (*id.* at 7).  The Restaurant, in fact, only

paid him $7 per hour.  (*Id.* at 20.)  He received no training and was not given any kind of

employee handbook or guidelines.  (*Id.* at 7.)  During his second week of employment, Moore

was singing along with the radio when a co-worker, Reggie, shouted at him for singing, using

extremely offensive and derogatory language.[2]  (*Id.* at 8.)  Moore stated that he was very hurt by

these words, but that he was more hurt when he brought this incident to the attention of his

supervisor, and his supervisor dismissed it.  (*Id.* at 9.)  Moore's supervisor did not speak with

Reggie, but merely made excuses for him.  (*Id.* at 8.)  Two or three days later, Reggie confronted

Moore for reporting the incident, screaming at Moore and threatening him with physical violence

if he reported Reggie to the supervisor again.  (*Id.* at 9.)

About one week later, on or around October 27, 2006, another co-worker, Katie Doe,

approached Reggie and began asking probing and embarrassing questions about Moore's sex life.

---

[2] I will not repeat the vulgar words used by Reggie; suffice it to say, his language
contained offensive epithets degrading African Americans and homosexuals.

(*Id.* at 11.)  Moore responded by asking her to stop, then he asked if she was "asinine."  (*Id.*)  Use of the word "asinine" angered Katie, and she immediately reported this incident to their supervisor.  (*Id.*)  The supervisor responded by telling Moore that the use of the word "asinine" in front of customers was against company policy and promptly terminated his employment.  (*Id.*)  Moore pointed out that Reggie had used racial epithets and threats of violence in front of customers, yet had not even been reprimanded.  (*Id.*)  Moore's protests, however, were to no avail and he was terminated.  (*Id.*)  During the week between the incidents with Reggie and Katie, Moore faced continuous lewd gestures, name-calling and snickering every time he was in the vicinity of Reggie.  (*Id.* at 12-13.)

Moore seeks economic damages from lost wages, lost career opportunities, and costs associated with losing his apartment as a result of his termination.  (Suppl. at 5.)  Moore worked for about 35 hours per week from October 6, 2006, until he was terminated on October 27, 2006.  (Tr. at 21.)  At $7 per hour, Moore was making approximately $245 per week.  Just before taking the host position, Moore turned down an administrative position with a non-profit organization, Entertainers for Education Alliance, which would have paid $12 per hour, because he was passionate about working in the food service industry.  (*Id.* at 20.)

Moore obtained a food service position at Brooklyn Farms shortly after being terminated from the Restaurant, but quit a week later because he felt uncomfortable, suspecting that the employees were ridiculing him and his lifestyle.  (*Id.* at 15.)  After quitting Brooklyn Farms, Moore returned to school, earned his GED, and is now taking classes to earn a business degree.  (*Id.* at 26.)  Moore stated that his previous passion for the food service industry dissolved as a result of the incidents at the Restaurant.  (*Id.* at 14.)

Because he was not working, Moore could not pay his rent and went into arrears. (*Id.* at 17.) He was evicted shortly after his termination, and moved back in with his mother. (*Id.* at 17, 26.) Moore stated that he incurred $1,200 in moving expenses as a result of his eviction. (*Id.* at 22.)

In addition to his economic damages, Moore stated that he suffers from depression, loss of sleep, and decreased motivation. (*Id.* at 14.) He also testified that he suffered "massive weight loss" after the incident. (*Id.*) Moore also told the Court that he no longer accepts his sexual orientation identification as a result of these incidents. (*Id.*) Dr. Darcy M. Smith, a psychologist who examined Moore and issued a report in preparation for the hearing, found that Moore suffered from Major Depressive Disorder and Post-Traumatic Stress Disorder ("PTSD").[3] (Court Exh. 1 at 4-5.) Dr. Smith noted that due to the discriminatory treatment by the Restaurant, Moore lost interest in his career, refused to identify as a homosexual, and lost his locus of control with respect to his self-sufficiency and career ambitions. (*Id.*) Dr. Smith recommended individual therapy three times per week for no less than three years to treat the above-referenced

---

[3] While the Court agrees that Moore suffered a traumatic event, the incident does not appear to rise to the level of trauma usually associated with PTSD. According to the Diagnostic and Statistical Manual for Mental Disorders, "[t]he essential feature of [PTSD] is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of *an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity*." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS TEXT REVISION ("DSM-IV-TR") 463 (4th ed. 2000) (emphasis added). Although not an exhaustive list, the DSM-IV-TR gives examples of typical predicate events, such as: military combat, violent personal assault, being kidnapped or taken hostage, terrorist attack, torture, incarceration as a prisoner of war, natural or manmade disasters, severe automobile accidents, or being diagnosed with a life-threatening illness. *Id.* at 463-64. While not diminishing the severity of the experience, Moore did not experience the type of trauma typically associated with PTSD.

diagnoses, and access to the services of a psychiatrist throughout the duration of that period in order to rule out the need for medication. (*Id.* at 5.)

At the conclusion of the hearing, Moore persuasively argued that the disparaging treatment he suffered was egregious, that defendants' wanton disregard for federal, state, and city civil rights laws caused him deep emotional distress, and that it was important to send a message to employers, specifically Mantiff and Dharia, that this treatment will not be tolerated by the courts. (Tr. at 26-28.)

During the hearing, I observed that Moore was alert and well spoken. It was clear that this incident left a deep emotional scar and that his distress was genuine.

<u>**CONCLUSIONS OF LAW**</u>

A default judgment amounts to an admission of liability to all of the well-pleaded allegations in a plaintiff's complaint pertaining to liability. *See, e.g., Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995); *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973) ("[A] default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability."). It is not, however, an admission of damages; as such, plaintiffs must still establish an evidentiary basis for all damages claimed. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). If damages are not liquidated or susceptible to mathematical computation, the plaintiff must generally establish the basis for all damages claimed at an evidentiary hearing. *Id.*

I.     **Liability**

Title VII, NYSHRL, and NYCHRL all aim to assure equality of employment opportunities and make employers liable for damages to a plaintiff-employee who suffered

6

discrimination based on race, gender, religion or national origin in the workplace. *See McDonnell Douglas v. Green*, 411 U.S. 792, 800 (1973); *Aurecchione v. N.Y.S. Div. of Human Rights*, 98 N.Y.2d 21, 25 (2002) (recognizing that the legislature intended both to combat discrimination and provide a system of redress when it enacted the NYSHRL); N.Y.C. ADMIN. CODE §§ 8-101, 8-107, 8-502. NYSHRL and NYCHRL also add "sexual orientation" to the list of protected groups. N.Y. EXEC. LAW § 296(1)(a); N.Y.C. ADMIN. CODE § 8-107. In order to establish a prima facie case of employment discrimination under these laws, a plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Ercole v. U.S. Dep't of Transp.*, No. 07-CV-2049, 2008 WL 4190799, at *6 (E.D.N.Y. Sept. 10, 2008) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000)); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n.3 (2004) (NYSHRL and NYCHRL discrimination claims are analyzed under the same framework as Title VII).[4]

Moore has met his prima facie burden to establish the liability of Mantiff and Dharia. In his complaint, Moore established that he was African American and homosexual and that he suffered discriminatory treatment by coworkers at the Restaurant based on his race and sexual orientation. (Compl. ¶¶ 24-31.) He also alleged that his supervisors did nothing to address this

---

[4] NYCHRL is generally to be construed more liberally than its state and federal counterparts to serve its "uniquely broad and remedial purpose." N.Y.C. ADMIN. CODE § 8-130. State and federal decisions still constitute precedent where they "are viewed as a floor below which [NYCHRL] cannot fall, rather than a ceiling above which the local law cannot rise." *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 66-67 (1st Dep't 2009) (internal quotations omitted). Since Moore is protected even under the stricter standards of Title VII and NYSHRL, it is unnecessary to independently review his claims under the broader NYCHRL standards.

discrimination and terminated Moore one week later under pretext of using vulgar language. (*Id.* at ¶¶ 30, 32-34.)

It is, however, well-settled law in the Second Circuit that Title VII does not permit individual liability, even where the defendant exerts supervisory control over the employee. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1314 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). Under New York law, however, individual liability may attach where the individual has an ownership interest in the employer corporation. *See Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542 (1984); *Gallegos v. Elite Model Mgmt. Corp.*, 28 A.D.3d 50, 60 (1st Dep't 2005) (holding that where an individual was "cofounder, president and a 10% shareholder," that individual could be subject to individual liability); *Brotherson v. Modern Yachts, Inc*., 272 A.D.2d 493, 494 (2d Dep't 2000) ("A corporate employee may be individually subject to an employment discrimination suit . . . if he or she has an ownership interest in the corporate employer . . . .").

Mantiff is liable under Title VII (as well as the pendent state and city law claims) as an employer, but Dharia, as an individual, is not. Nevertheless, Dharia may be held liable under NYSHRL and NYCHRL as the founder and president of Mantiff. (Compl. ¶ 12; *see also* Suppl., Exh. G.) Accordingly, Moore properly established the liability of both Mantiff and Dharia.

II.    **Damages**

Title VII, NYSHRL, and NYCHRL entitle a plaintiff to compensatory damages[5] for

---

[5] Title VII also permits recovery of punitive damages. 42 U.S.C. § 1981a(a)(1). However, Moore included only a general request for punitive damages in his complaint, failing to specify an amount sought or any method of calculation. (Compl. ¶ e.) His subsequent submissions lacked any reference to punitive damages, and at the hearing, counsel merely expressed hope that "the damages here will be considered punitive." (Tr. at 28.) In light of such

pecuniary loss as well as pain and suffering. Although Title VII limits the amount of damages

that may be awarded, the NYSHRL and NYCHRL do not. The Title VII damages cap, therefore,

does not bar compensatory damages in excess of this cap where a plaintiff pleads pendant state

law claims. *See, e.g.*, *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 204 (S.D.N.Y. 2001) (allocating

damages between successful NYSHRL and Title VII claims such that damages exceeded Title

VII cap); *Bick v. City of New York*, No. 95 Civ. 8781, 1998 WL 190283, at *22 (S.D.N.Y. Apr.

21, 1998) (awarding damages in excess of Title VII cap where compensatory damages could be

allocated to a successful NYSHRL claim); *Luciano v. Olsten Corp.*, 912 F. Supp. 663, 675-76

(E.D.N.Y. 1996) (same).

A.    Economic Loss

Victims of employment discrimination are entitled to reasonable damages that would

make the plaintiff "'whole for injuries suffered on account of unlawful employment

discrimination.'" *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998) (quoting

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)). An award of back pay, although not

automatic, is generally awarded absent special circumstances. *Carrero v. N.Y.C. Hous. Auth.*,

890 F.2d 569, 580 (2d Cir. 1989) ("An award of backpay is the rule, not the exception" under

Title VII.); *N.Y.S. Office of Mental Health v. N.Y.S. Div. of Human Rights*, 53 A.D.3d 887, 890

---

a vague request, I recommend that Moore's punitive damages claim be deemed abandoned. *See, e.g.*, *Leisure Direct, Inc. v. Glendale Capital, LLC*, No. 05-CV-4473, 2010 WL 3782049, at *6 (E.D.N.Y. July 27, 2010), *adopted by* 2010 WL 3782042 (deeming punitive damages claim abandoned where affidavit in support of damages failed to mention punitive damages even though they were sought in the complaint); *Suisman, Shapiro, Wool, Brennan, Gray & Greenberg, P.C. v. Suisman*, No. 3:04-CV-745, 2006 WL 387289, at *14 n.5 (D. Conn. Feb. 15, 2006) (finding plaintiff's claims for punitive damages set forth in the complaint to be abandoned because plaintiff failed to mention these claims in its motion for summary judgment).

(3d Dep't 2008) (noting that the "purpose of back pay [for an NYSHRL claim] is to make a person whole and redress the economic injury that has resulted from unlawful employment discrimination," but denying back pay where the loss of wages was attributable to circumstances other than discrimination).

Plaintiffs alleging employment discrimination are, however, required to mitigate their damages. *Pa. State Police v. Suders*, 542 U.S. 129, 146 (2004) (Title VII borrows from tort law a plaintiff's duty to use reasonable measures to avoid or minimize damages); *Dailey v. Societe Generale*, 108 F.3d 451, 455 (2d Cir. 1997); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 908 (2d Cir. 1997) ("The NYSHRL substantially tracks Title VII . . . in its requirement that plaintiffs mitigate their damages by seeking and accepting alternative employment . . . ."). "A discharged employee 'must use reasonable diligence in finding other suitable employment,' which need not be comparable to their previous positions." *Greenway*, 143 F.3d at 53 (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32 & n. 15 (1982)).

A plaintiff's decision to forgo employment to instead pursue a full-time education has elicited mixed responses from the courts. *See Dailey*, 108 F.3d at 456 (noting that there is no per se rule finding the decision to attend school full-time incompatible with a plaintiff's Title VII duty to mitigate damages); *cf. EEOC v. Local 638*, 674 F. Supp. 91, 104 (S.D.N.Y. 1987) ("An individual who abandons his willingness to search for and return to work and opts to attend school instead generally does not meet his duty to mitigate damages during the time he is in school."). In *Dailey v. Societe Generale*, the court distinguished between a plaintiff who "voluntarily absents [himself] from an active job market" from a plaintiff who opts to return to school after a diligent yet unsuccessful job search. 108 F.3d at 457.

Moore's situation falls into the former category. In *Daily*, the plaintiff satisfied the duty

to mitigate where she chose "to attend school only when diligent efforts to find work prove[d]

fruitless." 108 F.3d at 457. Rather than actively search for employment, however, Moore

resigned himself to the fact that he was unable to work soon after his termination. (Tr. at 14-15.)

While the Restaurant's conduct was atrocious and Moore's distress genuine, it was not

reasonable for a person in his position to give up looking for work altogether. In fact, Moore

found another, comparable job with Brooklyn Farms, but quit.[6] Moore's attorney acknowledged

that there might be an element of an "eggshell plaintiff" in this case, (Tr. at 27), but the duty to

mitigate requires objectively reasonable efforts to find employment. Moore made a choice to

return to school rather than to look for other work, and as such, it would be inappropriate to

award Moore damages for the entire four and one half year period of his unemployment.

A failure to mitigate damages, however, does not necessarily prohibit Moore from

recovering any compensatory damages. While a plaintiff who fails to mitigate is not entitled to

---

[6] I note that usually an employment discrimination victim is only entitled to lost wages for the period between discharge and securing comparable employment—in this case, obtaining a position with Brooklyn Farms. *See Sims v. Mme. Paulette Dry Cleaners*, 638 F. Supp. 224, 230 (S.D.N.Y. 1986) (citing *Ford Motor Co.*, 458 U.S. at 234-35). However, given the "make-whole" purpose of compensatory damages and the goal of preventing future discrimination, Moore's award should not be so strictly limited under the rule. After all, plaintiffs in employment discrimination cases are "entitled to 'full redress for the effects of discrimination[,]'" and Moore quit Brooklyn Farms because of the emotional distress caused by the Restaurant's discriminatory treatment. *Sims*, 638 F. Supp. at 230 (quoting *Ford Motor Co.*, 458 U.S. at 232). *Cf. Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998) ("The ultimate question is whether the plaintiff acted reasonably . . . in rejecting proffered employment.") (internal quotations omitted); *N.L.R.B. v. Pepsi Cola Bottling Co. of Fayettville, Inc.*, 258 F.3d 305, 310-11 (4th Cir. 2001) ("Where an employee justifiably or reasonably quits interim employment, he does not forfeit his right to backpay."); *Griffin v. George B. Buck Consulting Actuaries, Inc.*, 566 F. Supp. 881, 882 (S.D.N.Y. 1983) (court must offset back pay of a plaintiff who quits equivalent employment "*without adequate reason*").

the full amount of lost wages he would have made during the period in which he failed to

mitigate, he is still entitled to an amount that would make him whole. *See Johnson v. Spencer*

*Press of Maine, Inc.*, 364 F.3d 368, 382 (1st Cir. 2004) (holding that "back pay is not [per se]

permanently terminated when an employee . . . voluntarily quits interim employment"); *Dilley v.*

*SuperValu, Inc.*, 296 F.3d 958, 966 (10th Cir. 2002) (upholding trial court's decision to award

back pay for a portion of time following the plaintiff's termination based on the plaintiff's failure

to mitigate); *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 867 (3d Cir. 1995) (finding that a

plaintiff who failed to mitigate was still entitled to some back pay in order to make him whole).

 Because Moore failed to adequately mitigate his damages, he is not entitled to back pay

for the full period of his unemployment. Rather, in light of his employment history, he can be

made whole by an award of lost wages for a year and a half of unemployment following his

termination.[7] Thus, a reasonable amount of lost wages to make Moore whole in this case is

$19,110 ($7 per hour for an average of thirty-five hours per week over a one and a half year

period).[8] Additionally, Moore should be awarded the $1,200 incurred as moving expenses.

---

 [7] Using his employment history as a guide, I estimate that Moore would likely have spent approximately a year and a half employed at the Restaurant had this incident not occurred; thus to make him whole, that is the period of time for which he should be compensated. In the four to five year period prior to working at the Restaurant, Moore worked for three separate employers, all in the food service industry. (Court Exh. 1 at 2.) First, he worked at McDonald's for one year. (*Id*.) He then worked at Balducci's gourmet market for two and one-half years. (*Id*.) Finally, Moore was employed at Garden of Eden for eight months. (*Id*.)

 [8] Moore's complaint alleges lost salary and benefits; however, Moore failed to provide any information about benefits in the complaint, supplement, or at the hearing. Accordingly, there is no basis to award damages for lost benefits. Additionally, Moore seemed to suggest that he was entitled to be compensated at either the rate he claims he was promised ($9/hour), but never paid, or the rate Entertainers for Education Alliance would have paid ($12/hour) had he accepted the job. However, neither amount would properly constitute lost wages to make him whole, since he was never in fact paid either amount, nor would he have been if the incident had

Accordingly, I respectfully recommend Moore be awarded $20,310 in lost wages and associated costs.

B.     Emotional Distress

Plaintiffs in employment discrimination cases may recover a broad spectrum of emotional distress damages.  *See Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009); *Rainone v. Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005).  Emotional distress claims are generally of three varieties: "garden-variety," "significant" or "egregious."  *Rainone*, 388 F. Supp. 2d at 122.  This approach has been used in damages inquests on default judgments as well as review of jury verdicts.  *See, e.g.,  Maher v. Alliance Mortgage Banking Corp.*, No. 06-CV-5073, 2010 WL 3516153, at *2 (E.D.N.Y. Aug. 9, 2010).

Typical, or "garden-variety," emotional distress claims contain little evidentiary support, and are marked by "vague or conclusory" testimony of emotional harm without explanation of the severity or consequences of the harm.  *Rainone*, 388 F. Supp. 2d at 122.  Plaintiffs with garden variety claims generally receive between $5,000 and $35,000.  *Id.*  "Significant" emotional distress claims are based on "more substantial harm or more offensive conduct[,]" and are often supported by medical evidence or corroborating testimony; these claims are typically worth $50,000 to $100,000.  *Id*. at 122-23; *Olsen*, 615 F. Supp. 2d at 47-49 (upholding award of $100,000 where plaintiff had documented medical evidence that she suffered from depression, lack of sleep, powerlessness, and lack of motivation); *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 67-68, 73-74 (E.D.N.Y. 2002) (reducing a jury award of $150,000 to $50,000 for one plaintiff who established "numerous instances where managers made disparaging remarks

_____

not occurred.

about African Americans" and a negative effect on his personal and professional life, but who did not pursue a course of psychological treatment).  Finally, "egregious" emotional distress claims, where courts have upheld awards of over $100,000, exist where the discrimination alleged is "outrageous and shocking or where the physical health of plaintiff was significantly affected."  *Rainone,* 388 F. Supp. 2d at 123.

Considering the egregious conduct of the Restaurant, Moore's testimony regarding loss of enjoyment in his personal and professional life, and the report by Dr. Smith diagnosing Moore with depression,[9] Moore suffered more than typical "garden variety" emotional distress.  Moore's injuries most closely resemble the facts in *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d at 74, where plaintiffs were awarded between $20,000 and $75,000 in compensatory damages having shown overt racial discrimination and termination without cause coupled with some specific evidence of adverse effects.  Therefore, I respectfully recommend that he be awarded $50,000 for emotional distress damages since such request is reasonable and aligned with awards in similar cases.

### III.    Attorneys' Fees & Costs

Plaintiff also seeks both costs and attorneys' fees.  Under Title VII and NYCHRL, a

---

[9] Dr. Smith estimated the cost of Moore's psychological treatment to be $187,200 for therapy three times per week for three years, and $10,800 for 36 sessions with a psychiatrist over the same period. (Court Exh. 1 at 4-5.)  At the hearing, counsel requested that Moore be awarded these future medical expenses as part of his compensatory damages.  (*See* Tr. at 19.)  In part, I decline to add such medical costs because the diagnosis of PTSD is not well supported in the report as previously explained, s*ee supra* n. 3, but also because Moore never sought future medical costs in either his complaint or supplemental court submissions.  *See* FED. R. CIV. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").  Nevertheless, I considered the report and purported cost of future treatment in my assessment of Moore's emotional distress damages.

plaintiff may seek, and the court may award, reasonable attorneys' fees and costs. 42 U.S.C. §

2000e-5(k); N.Y.C. ADMIN. CODE § 8-502(f).[10] Applications for fee awards must be documented

by time records which specify the date, time expended, hourly rate, and description of the work

done by each attorney . *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *N.Y.S. Ass'n for*

*Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). Determining the

reasonableness of the fee to be awarded is within the sound discretion of the district court. *Arbor*

*Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of*

*Elections*, 522 F.3d 182, 190 (2d Cir. 2008) (noting the "considerable discretion" trial courts

exercise in awarding attorneys' fees).

Upon reviewing the fee application, courts should "bear in mind *all* of the case-specific

variables that . . . have [been] identified as relevant to the reasonableness of attorney's fees in

setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be

willing to pay." *Id.* Factors to consider include, *inter alia*: the novelty and difficulty of the

questions, the level of skill required to perform the legal service properly, the attorney's

customary hourly rate, the amount involved in the case and the results obtained, and the

experience, reputation, and ability of the attorneys. *Id.* at 186-87, 189 (referencing and quoting

the factors identified in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.

1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92-93, 96 (1989)).

---

[10] The Title VII and NYCHRL provisions are substantively and textually similar, *McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d 421, 434 (2004); therefore, the reasonableness of fees in this case would be analyzed the same regardless of which provision provides Moore's recovery. *See id.* at 429 ("Where [NY] state and local civil rights statutes are substantively and textually similar to their federal counterparts, [the New York Court of Appeals] has generally interpreted them consistently with federal precedent.").

Courts should also generally take into consideration the prevailing rates of the district in which it sits. *See Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174-75 (2d Cir. 2009) (defining the parameters of the forum rule).  Finally, courts must also exclude from the award "excessive, redundant or otherwise unnecessary hours." *Lyons P'ship, L.P. v. D & L Amusement & Entm't, Inc.*, 702 F. Supp. 2d 104, 120 (E.D.N.Y. 2010) (quoting *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999)).

The billing records submitted by Moore reflect a total of 232.85 hours expended at hourly rates of: $300-375 for a senior partner, junior partner, junior associates and of counsel; $225 for paralegals and associates not yet admitted to the bar; and $175 for a legal secretary and a student law clerk.  (Suppl., Exh H.)  Moore requested $40,000.00, reducing the total billing from $53,167.50 since a portion of the time expended involved settlement with Houlihan's.  (Suppl. at 6.)  However, even with this reduction and taking into consideration the above-enumerated factors, this amount exceeds a reasonable award in this case.

In this District, approved "hourly rates for attorneys . . . have [normally] ranged from $200 to $350 an hour for partners, $200 to $250 for senior associates with four or more years of experience, $100 to $150 an hour for junior associates with one to three years of experience, and $70 to $80 for legal assistants." *Eu Yan Sang Intern. Ltd. v. S&M Enters. (U.S.A.) Enterprise Corp.*, No. 09-CV-4235, 2010 WL 3824129, at *7 (E.D.N.Y. Sep. 8, 2010), *adopted by* 2010 WL 3806136 (E.D.N.Y. Sep. 23, 2010).  Additionally, it is worth noting that the case does not present novel or complex questions of fact or law.  Moreover, since the defendants never appeared, plaintiff's burden litigating this case was minimal.

I therefore respectfully recommend setting reasonable hourly rates at: $325 for Yetta

Kurland and Michael Sapio (each with 10 or more years of experience); $300 for Gina Bonica (junior partner with 7 years if experience); $175 for Gregory Binstock and Erica Kagan (junior associates with 2-4 years of experience) and $80 for all paralegal, legal assistant or law clerk hours. Additionally, hours billed regarding a press conference do not reflect appropriate expenditures for this case, and I therefore eliminated those hours from my calculation.[11] *See, e.g., Yea Kim v. 167 Nail Plaza, Inc.*, No. 05-CV-8560, 2009 WL 77876, at *1 (S.D.N.Y. Jan. 12, 2009) (reducing award of attorneys' fees in part because of questionable time billed for press conference). Therefore, I respectfully recommend that the $40,000.00 requested be reduced to $26,198.00.

Reasonable costs include those "reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998). Plaintiff requests $505.43 from court filing fees, process server fees and shipping costs. (Suppl., Exh. H.) Additionally, at the hearing, plaintiff requested reimbursement for the psychological consultation of Dr. Smith, and subsequently submitted an invoice for $750. (Dkt. 20.) Expert fees are specifically recoverable as costs under Title VII. *See* 42 U.S.C. § 2000e-5(k). I therefore recommend that plaintiff be awarded Dr. Smith's consultation fee, bringing the total award of costs to $1,255.43. Accordingly, I recommend that plaintiff be awarded $27,453.43 in attorneys' fees and costs.

---

[11] These calculations are as follows: $5,411.25 for Yetta Kurland (16.65 hours), $227.50 for Michael Sapio (.7 hours), $2,940 for Gina Bonica (9.8 hours), $9,791.25 for associates (55.95 hours), and $7,828 for paralegals, legal assistants and law clerks (97.85 hours).

**CONCLUSION**

I respectfully recommend that judgment be entered against Mantiff and Dharia, jointly

and severally, in an amount of $97,763.43, which includes $50,000 for pain and suffering,

$20,310 for economic losses, and $27,453.43 for attorneys' fees and costs.

Any objections to this Report and Recommendation ("R&R") must be filed with the

Clerk of the Court and the Chambers of the Honorable Eric N. Vitaliano within fourteen days of

receiving the R&R.  Failure to file timely objection may waive the right to appeal the District

Court's Order.  *See* 28 U.S.C. § 636(b)(1)(c); FED. R. CIV. P. 6(a), 6(e), 72; *Small v. Sec'y of*

*Health and Human Servs.*, 892 F.2d 15,16 (2d Cir. 1989).  Plaintiff is directed to serve a copy of

this R&R on all defendants, including those previously dismissed from this action, and to

promptly file proof of service.


**Dated: Brooklyn, New York**
    **May 10, 2011**


*Ramon E. Reyes, Jr.*
    **Ramon E. Reyes, Jr.**
    **United States Magistrate Judge**